Filed 5/18/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| DUNCAN E. PRINCE,<br><br> Plaintiff, Cross-defendant and Appellant,<br><br> v.<br><br>INVENSURE INSURANCE BROKERS, INC.,<br><br> Defendant, Cross-complainant and Appellant;<br><br>ERM INSURANCE BROKERS, INC.,<br><br> Cross-defendant and Appellant. | G051996, G052060, G052122<br><br>(Super. Ct. No. 30-2013-00638387)<br><br>O P I N I O N |

Appeal from judgments of the Superior Court of Orange County, Geoffrey T. Glass, Judge. Affirmed in part and reversed in part, remanded.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication as to the introduction and parts I, II.B.1, and III only.

Silverstein & Huston, Steven A. Silverstein, Mark W. Hutson and Robert I. Cohen for Defendant, Cross-complainant and Appellant.

Law Offices of Andrew D. Weiss and Andrew D. Weiss; and R. Donald McIntyre for Plaintiff, Cross-defendant and Appellant Duncan E. Prince, and for Cross-defendant and Appellant ERM Insurance Brokers, Inc.

*         *         *

The parties appeal and cross-appeal a judgment after a jury trial in this business dispute. Plaintiff and cross-defendant Duncan E. Prince obtained a judgment of $647,706.48 against defendant and cross-complainant Invensure Insurance Brokers, Inc. (Invensure). Invensure took nothing on its cross-complaint against Prince and his related business entity, cross-defendant ERM Insurance Brokers, Inc. (ERM).

Invensure appeals from the judgment, arguing the trial court wrongly decided issues related to the statute of limitations and numerous issues with respect to substantial evidence to support the judgment. It also claims the court abused its discretion when admitting certain evidence.

Prince and ERM also appeal from two postjudgment orders, arguing the court erroneously granted a motion to tax costs and to deny them attorney fees. We find the court erred with respect to the validity of Prince's offer to compromise under Code of Civil Procedure section 998,[1] and remand that issue for further consideration by the trial court. We authorize publication with respect to our discussion of this issue only.

With respect to attorney fees, Prince argues he is entitled to attorney fees under Penal Code section 502. Invensure asserted a cause of action against him for violating this section, which includes an attorney fee provision. The court denied the

---

[1] Subsequent statutory references are to the Code of Civil Procedure unless otherwise noted.

2

motion, deciding the attorney fees under the Penal Code section 502 cause of action and the cross-complaint's remaining claims could not be apportioned. We disagree, concluding the causes of action in the cross-complaint all related to a common core of facts. Accordingly, we reverse the order denying attorney fees.

I

FACTS

*A. Underlying Facts*

As of 2003, Prince and Dick Fleming were the owners of an insurance agency, Prince & Fleming Insurance Brokers, Inc. (Prince & Fleming).[2] Prince focused on commercial insurance, while Fleming's specialty was life insurance and employee benefits. Similarly, Richard Sherman and Robert Parent were the owners of Sherman Parent Insurance Brokers (Sherman Parent). Their company did predominantly commercial property and casualty, personal home and auto, and employee benefits. Each of the four principals owned 50 percent of their respective agency.

In 2001 or 2002, representatives met and discussed a merger. They eventually hired Marsh, Berry & Company, Inc. (Marsh), to value both companies and assist in the merger. Marsh's initial report appraised Prince & Fleming at $3.2 million and Sherman Parent at $1.7 million as of December 31, 2002.

The companies discussed how to deal with the difference in valuation, but an agreement was not reached. The parties had agreed to have Marsh update its appraisal on the next year end date, December 31, 2003, and use that as the valuation date for tangible net worth. The initial appraisal date of December 31, 2002, would be used as a

---

[2] As we are required to do, we recite the facts in the manner most favorable to the judgment. (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1475, fn.1.)

3

valuation date for the book of business.[3] Sherman later testified he agreed to this because he thought Sherman Parent's value had increased during 2003.

The new appraisal valued Prince & Fleming at approximately $3.3 million, and Sherman Parent at approximately $1.5 million. Thus, Sherman Parent's value had actually decreased.

The companies decided to proceed with the merger anyway. Effective January 1, 2004, they entered into a contribution agreement to turn over all the stock in the respective companies to a new company, which eventually was named Invensure Insurance Brokers, Inc. In return, each principal received 25 percent of Invensure's common stock. The contribution agreement did not include an express provision addressing an adjustment for the value disparity between the two companies (disparity adjustment).

The parties concur that an agreement was reached on the disparity adjustment after the merger. On July 27, 2004, the parties met with Christopher Darst of Marsh, to discuss the matter. According to a letter from Darst to the principals, the agreement they reached was that Prince and Fleming would each receive an additional $125,000 each annually for six years. Prince's understanding was that the payments would begin sometime in the next 12 months following Darst's letter, which was dated August 6, 2004. No further actions were required by Prince or Fleming to be entitled to the payments. Thereafter, no objections were voiced by Sherman or Parent regarding this agreement. Both parties referred to this agreement as the "disparity note."

Invensure made the first payments to Prince and Fleming "at the end of 2004." They were paid through payroll. There were no payments in 2005, as agreed upon by the principals, due to decreased revenue. Prince and Fleming's understanding

---

[3] As Marsh explained in a letter to the parties: "There are two components of value, the book of business value, which is a value of the agency's earning stream, and the tangible net worth value, which is a liquidation value of the balance sheet."

was that the payment would be made up later, and it was not their intent to waive the payment. From 2006 to 2009, Invensure made payments to Prince in various amounts, totaling $409,000, which included the 2004 payment. Assuming an agreement with Prince to pay $125,000 a year, the total Invensure owed to Prince for six years was $750,000, leaving a principal shortfall of $341,000.

In 2007, Fleming began talking about reducing his role in the business. In 2008, with the agreement of the remaining principals, Invensure paid Fleming the amount due under the disparity note. Prince testified that he, Sherman, and Parent agreed to pay Fleming eight percent in interest on the amount due. Fleming also testified that interest was paid on the amount due on the disparity note. Thereafter, Invensure bought out Fleming's interest in the company, leaving Sherman, Parent, and Prince each one-third shareholders.

By November 2011, Prince had started to fall out with his fellow principals, and expressed his interest in leaving Invensure and starting his own brokerage. Marsh was brought in to do an appraisal, and appraised Prince's interest at $658,000. Marsh's reports also stated that Invensure still owned Prince "approximately $500,000" on the disparity note.

Attorneys for the parties began corresponding. On March 13, 2012, Thomas R. Kroesche, Invensure's attorney, sent a letter to R. Donald McIntyre, Prince's attorney, with proposed terms for a Letter of Understanding regarding Prince's departure from Invensure. McIntyre responded with some objections and questions on March 19. Kroesche replied with a counter-proposal on April 17. The letters were professional and did not appear to reflect that either party was contemplating litigation at the time.

Sherman and Parent agreed some money was due Prince under the disparity note. Sherman, with the help of an accountant, produced a spreadsheet entitled "Amortization Schedule of Duncan Prince Disparity Amount," which calculated the amount Invensure owed Prince at $485,357.61, which reflected the principal, interest of

5

eight percent for 60 months and three percent thereafter. (This spreadsheet was attached to the April 17 letter from Kroesche to McIntyre.)

Although Prince and Invensure seemed to substantially agree on many material points, negotiations did not lead to a sale of Prince's interest. Eventually, Invensure removed Prince from his director and officer positions, and fired him as an employee. During the time he was attempting to separate himself from Invensure, Prince founded ERM, a competing insurance brokerage.

*B. Procedural History*

Prince filed his initial complaint against Invensure for breach of contract, book account, and account stated on March 19, 2013. On July 1, he filed a first amended complaint (the complaint) stating the same three causes of action. The breach of contract claim was for alleged breach of the disparity note, and Prince attached the Marsh letter of August 6, 2004, as the written agreement. The remaining causes of action were different methods of pleading that Invensure owed Prince money on the disparity note.

Invensure cross-complained against Prince and ERM. We will discuss the cross-complaint in more detail in our analysis of the cross-appeal, but the common thread in its eight causes of action was unauthorized computer access and theft of trade secrets. Of the eight causes of action, four were submitted to the jury: breach of fiduciary duty; misappropriation of trade secrets (Civ. Code, § 3426 et seq.), violation of Penal Code section 502, and "breach of confidence." Invensure also asserted unauthorized computer access in its answer to Prince's complaint, alleging it was entitled to a setoff by way of an affirmative defense. Further, Invensure asserted that Prince's claims had been filed after the statute of limitations had run.

At the conclusion of a trial that lasted five weeks, the jury returned a general verdict form with a unanimous verdict in favor of Prince in the amount of

6

$647,706.48. Invensure took nothing on its cross-complaint. On Invensure's equitable claims, the trial court denied relief and awarded judgment to Prince and ERM. At Invensure's request, the court issued a statement of decision on the statute of limitations issue, which it had decided in Prince's favor. Invensure's motion for judgment notwithstanding the verdict or a new trial was subsequently denied.

Prince submitted a costs bill of $177,053.37, which included $134,682.53 in expert witness fees. Invensure filed a motion to tax costs, arguing, as relevant here, that Prince's expert witness fees were not recoverable. Prince responded that he had made a valid offer to compromise under section 998. The court granted the motion to reduce the expert fees by $129,409.58. Prince also sought attorney fees under Penal Code section 502, which the trial court denied.

Both parties filed appeals.

II

DISCUSSION

A. *Invensure's Appeal*

Invensure has identified numerous issues on appeal. Several of them are based on the trial court's rulings with respect to the statute of limitations. All but one of the other issues relate to the sufficiency of the evidence supporting the jury verdict. The last one disputes the trial court's evidentiary rulings with respect to the negotiations that preceded Prince's firing from Invensure.

Invensure has the burden of demonstrating error. "A fundamental principle of appellate practice is that an appellant "'must affirmatively show error by an adequate record. . . . Error is never presumed. . . . 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent . . . .' [Citation.]" [Citation.]'" (*Null v. City of*

7

*Los Angeles* (1988) 206 Cal.App.3d 1528, 1532-1533; see *State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.)

At numerous points in its reply brief, Invensure attempts to raise new points for the first time that are not responsive to Prince's brief. This is improper, and such arguments are disregarded. (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 108.) Further, Invensure's reply brief is poorly organized and skips from topic to topic, combining issues that were addressed separately in its opening brief. While we have attempted to parse Invensure's arguments, any point omitted is deemed waived. Further, Invensure raised a new case during oral argument, but apparently did not provide notice of this to the opposing party. Accordingly, we decline to consider it.

### 1. *Statute of Limitations*

Invensure asserted that the statute of limitations had run on Prince's claims for breach of contract, open book account, and account stated. Initially, the trial court granted Invensure's request to bifurcate this issue and hear testimony on the statute of limitations first. As testimony progressed, however, it became clear that bifurcation was not going to save any time, and the court later reversed itself.

The court ultimately ruled that Prince's complaint was timely as a matter of law, no matter which cause of action was involved, because the last payment on the disparity debt was made less than four years before the filing of his complaint. The court ruled that Prince's right to these payments was pursuant to an "obligation . . . founded upon an instrument in writing." (§ 337, subd. (1).) The court further concluded the limitations period for account stated and an open book account were four years each for each cause of action. (§ 337, subd. (2).) Invensure asserts the court made various errors with respect to the statute of limitations, which we address in turn.

8

### a. Applicable Statute of Limitations

As Invensure concedes, factual issues surrounding this issue are governed by the substantial evidence standard. "When findings of fact are challenged in a civil appeal, we are bound by the familiar principle that 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We view the evidence most favorably to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. [Citation.]" (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100.) Substantial evidence may be contradicted or uncontradicted. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.) "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) We do not "weigh the evidence . . ., or judge the credibility of witnesses" (*Hauter v. Zogarts*, *supra*, 14 Cal.3d at p. 110), and the testimony of a single witness may alone constitute substantial evidence (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614). Further, this court is bound by implied findings made by the trial court, such as rejecting a witness's testimony. (*Stafford v. Mach* (1998) 64 Cal.App.4th 1174, 1182.)

The complaint alleged Invensure had breached a written contract – the August 6, 2004 letter. Invensure argues any agreement was oral, and was thereby governed by the two-year statute of limitation in section 339, subdivision (1), while Prince asserts the four-year statute set forth in section 337, subdivision (1), was properly applied.

The trial court disagreed with Invensure, opining in its statement of decision: "This case is about the . . . oral agreement to account for difference in value between the initial contributions by Prince and by the other principals to Invensure. The parties reached that oral agreement in July 2004. A third party facilitator [Darst] (hired

9

by the parties to the agreement) documented the agreement in a letter dated August 6, 2004. The parties and counsel called this letter the 'Disparity Note,' although the court found that this was not a promissory note as the law defines that term. (To the extent that [§] 360 is limited to promissory notes, it is inapplicable to this agreement.) [¶] The evidence is persuasive that the August 6, 2004, letter was an attempt to document the oral agreement reached at the meeting in July. The agreement, therefore, is an oral one, with a written memorandum setting out the terms. The four-year statute of limitations for breach of written contracts applies in such an instance . . . . A contract need not be signed to be considered 'in writing' for statute of limitations purposes."

The court then noted there was some ambiguity about the due date for the payments. The court noted that Invensure's actual conduct was to pay Prince at the end of the year beginning in 2004, and noted the history of uneven payments after 2004 we discussed above. "Assuming the contract is divisible, 'when money is payable in installments, the statute of limitations begins to run against a cause of action for the recovery of an unpaid installment at the time it becomes payable. . . .' [Citation.] [¶] On the other hand, if a party unequivocally acknowledges the debt, that action tolls the statute of limitations. . . . [Citation.] [¶] Thus, making any payments against a debt tolls the statute of limitations during the period of the payments. The tolling can be indefinite so long as the payments continue. The theory is that the payment is an acknowledgment of the indebtedness raising an implied promise to continue payments through the balance of the debt. [Citation.]"

The court continued: "The court concludes that a payment of principal on a continuing obligation, such as Invensure's payment on its promise to Prince, continues the original obligation through a new statutory period. As long as the obligator makes such payments within four years of each other, the statute of limitations will be tolled indefinitely. [Citation.] [¶] Neither party disputed the evidence that Invensure made payments toward the 'disparity' money due to Prince as late as June 2009. Further, all

10

three of Invensure's principals (including . . . Prince himself) discussed and agreed to credit those partial payments against Invensure's obligation. The four-year bar, therefore, did not run until July 2013 and the present lawsuit is timely." The court concluded the same statute applied to Prince's claims for open book account and account stated.

Invensure's fundamental disagreement is not with respect to the court's tolling analysis; rather, it contends there is not substantial evidence that the contract was one founded on a writing, "where no party participates or prepares the writing, does not sign the writing, nor later expressly agree to the writing is an 'agreement founded on that writing' is absurd." Invensure, however, concedes the writing need not be signed. It offers no case law supporting its contention that whether a party prepared the writing is of legal import. And its third contention, regarding express agreement to the writing, is not supported by the evidence.

Invensure cites to *Amen v. Merced County Title Co*. (1962) 58 Cal.2d 528, 532-533, where the California Supreme Court explained "[t]he contract may be 'in writing' for purposes of the statute of limitations even though it was accepted orally *or by an act other than signing*." (Italics added.) Because the writing provides clear evidence of the contract's fundamental terms, the court held the longer statute of limitations was appropriate. "When a party has agreed to the writing [by words or conduct], there is no reason to invoke the two-year statute of limitations applicable to oral agreements." (*Id.* at p. 533.)

Invensure demonstrated its express agreement to the contract, as set forth in the letter, by beginning to perform it. Thus, this is not a case, as Invensure claims, where one party "did not respond" to the written memorialization of the agreement's terms. There was ample evidence of Invensure's conduct, from the use of the term "disparity note" by the parties (including Invensure's counsel), the payments beginning in 2004, its subsequent payment of all amounts due to Fleming, and its decision to negotiate the point

11

when Prince decided to leave. Further, there is no evidence that Invensure ever said the letter was wrong or inaccurately stated the terms of the oral agreement.

One reason for a shorter statute of limitations for oral agreements is that memories fade and witness testimony becomes less reliable as time goes by. (See, e.g., *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 940 [statutes of limitation generally].) But when an agreement that began as an oral one is subsequently memorialized in writing, the parties act as if it were the agreement, and fail to dispute that the writing correctly sets forth the material terms, there is simply no reason for the shorter statute of limitations to apply. Here, there was more than substantial evidence that the Darst letter correctly memorialized the terms of the oral agreement. Therefore, the court properly decided the four-year statute of limitations applied.

### b. *Court's Ruling on Statute of Limitations*

Invensure next argues the issue of the statute of limitations should have been decided by the jury, arguing it was an error of constitutional proportion for the court to decide this issue. Invensure, however, has changed its position completely on this question. Prior to trial, it filed a motion to bifurcate, seeking to try its defenses of equitable estoppel and statute of limitations separately, and arguing they are both triable to the court. Invensure argued that disposing of the equitable estoppel issue first might eliminate the need for a jury trial altogether, and the court had discretion to do so. Invensure's counsel argued the trial court, not the jury, should decide the statute of limitations in order to reach the issue of equitable estoppel.

The court, as mentioned above, initially granted the motion to bifurcate, but reversed itself after hearing the first hour of testimony, concluding bifurcation would not save any time. The court essentially restarted the trial and directed Prince to call his first witness.

Invensure argues that the court's reversal on its motion to bifurcate is determinative on the issue of whether it has waived any argument that the court could decide its statute of limitations defense. We disagree. Whether looked at as waiver or invited error, Invensure repeatedly asserted the court could and should decide the statute of limitations issue, which it ultimately did. It stated in open court it did not want a jury trial on the issue: "[I]t's not a jury issue, your honor, in this case because it is a threshold inquiry that must be made in order to reach the equitable estoppel issue that plaintiff raised in their [*sic*] amended complaint." The inverse was also true, however – once the court decided the statute of limitations issue, it had no reason to reach the equitable estoppel issue.[4]

Invensure's conduct constituted a waiver of a jury trial on the issue, regardless of whether the court ultimately granted the motion to bifurcate or not. Filing written consent with the court or stating orally on the record that a jury trial was waived constitutes a valid waiver. (§ 631, subd. (f)(2), (3).) Invensure repeatedly asserted it was for the court to decide the issue of the statute of limitations, only changing its position during a discussion of jury instructions much later in the trial. The trial court, in its statement of decision, expressly stated that "Invensure requested that the court, not the jury, determine the applicability of the statute of limitations."

Moreover, the court ultimately determined there were no factual disputes for the jury to decide. Resolving the statute of limitations issue is normally a question of fact, but where the uncontradicted facts are susceptible of only one legitimate inference, the court may decide the issue as a matter of law. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [motion for summary judgment].) As to whether there was a written

---

[4] Invensure argues otherwise, but its argument is premised on the notion that the two-year statute of limitations applied. As stated above, we disagree. Invensure also argues that for any damages prior to June 2009 to be allowable, Prince was required to establish equitable estoppel. We address that *post* with Invensure's damages argument.

13

agreement, the court found there was no "credible evidence" from which the jury could decide otherwise, and on the issue of whether the last payment was made, the court found there was "no dispute at all." While Invensure claims the Darst August 2004 letter was no more than "notes" of what the oral agreement was, this ignores the remaining evidence with regard to the parties' conduct and Invensure's counsel's own words, which characterized the agreement to pay Prince as the "disparity note." In its reply brief, Invensure argues that there was a factual dispute as to whether Darst, the Marsh representative, was asked to prepare the August 2004 letter. This is simply a red herring without legal import.

Accordingly, the court could properly decide the statute of limitations issue as a matter of law – just as Invensure had requested. (Evid. Code, § 310, subd. (a); § 598.) We conclude there was no error.

### c. Section 360

In a brief and somewhat confusing argument, Invensure seems to assert that because the trial court determined that the disparity note was not a "promissory note" under section 360, Invensure cannot have acknowledged its debt sufficiently to invoke an extension to the statute of limitations. Therefore, Prince could not recover for debt incurred more than four years before he filed his complaint.

Section 360 is found in part 2 of title 2 of the Code of Civil Procedure, which sets forth the statute of limitations for various causes of action. It states: "No acknowledgment or promise is sufficient evidence of a new or continuing contract, by which to take the case out of the operation of this title, unless the same is contained in some writing, signed by the party to be charged thereby, provided that any payment on account of principal or interest due on a promissory note made by the party to be charged shall be deemed a sufficient acknowledgment or promise of a continuing contract to stop, from time to time as any such payment is made, the running of the time within which an

14

action may be commenced upon the principal sum or upon any installment of principal or interest due on such note, and to start the running of a new period of time, but no such payment of itself shall revive a cause of action once barred." (§ 360.)

There is no argument before us that the court did not properly conclude the disparity note was not a "promissory note," and it found section 360 was inapplicable to this case. Invensure's opening brief expressly states "section 360 does not apply," apparently agreeing with the court.

Invensure appears to be arguing that *unless* there is a promissory note, there is no way to acknowledge a debt through installment payments, and an express writing is required. But it cites no cases or argument to support this point in its opening brief.[5] In its reply brief, it again asserts this is an entirely "oral agreement," an argument we have already rejected, and asserts the various documents acknowledging the debt are insufficient in an entirely conclusory manner. Were we to analyze this issue, we would disagree. The bar for documents acknowledging a debt is not nearly as high as Invensure asserts; the disparity note and Invensure's letters constitute substantial evidence on this point. We find no error.[6]

### d. Measure of Damages Under the Four-Year Statute of Limitations

Invensure next asserts that even if the four-year statute of limitations applied, Prince cannot recover anything owed to him before 2009. What Invensure ignores, however, is that its repeated acknowledgment of the debt restarted the four-year statute of limitations. As the trial court put it: "[I]f a party unequivocally acknowledges the debt, that action tolls the statute of limitations. . . . [Citation.] [¶] Thus, making any

---

[5] The argument is properly waived on that ground alone. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

[6] Invensure also argues that the statutory grounds for tolling did not apply to this case. It provides no citations to the record that this was ever an issue below.

payments against a debt tolls the statute of limitations during the period of the payments. The tolling can be indefinite so long as the payments continue. The theory is that the payment is an acknowledgment of the indebtedness raising an implied promise to continue payments through the balance of the debt. [Citation.]"

The trial court was correct. Invensure focuses on when the cause of action was accrued, but that misses the point given the surrounding facts. Invensure made payments to Prince in 2004, 2006, 2007, and 2008, with the last payment in June 2009, thereby acknowledging the debt and restarting the clock on the statute of limitations. This matter was filed within four years of June 2009. Prince was therefore entitled to seek recovery of all amounts owed.

### 2. Substantial Evidence

Invensure's next claims are based on a purported lack of substantial evidence. The standard we use on appeal is explained in more detail *ante*, but in a nutshell, "'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.]" (*Oregel v. American Isuzu Motors, Inc.*, *supra*, 90 Cal.App.4th at p. 1100.) Put another way, this means the party arguing a lack of substantial evidence does not get to pick and choose the evidence in its favor while ignoring the evidence supporting the judgment. The burden is squarely on Invensure's shoulders to establish a lack of substantial evidence.

16

### a. Prince's Entitlement to Interest

There is no dispute that the disparity note did not initially include interest on the amount due. Invensure argues, therefore, that Prince was not entitled to it.[7] This, however, ignores events subsequent to the initial agreement in 2004.

Substantial evidence demonstrated that Prince and Fleming initially agreed to receive $125,000 each per year, for six years, with no interest. There is no question that payment schedule was not met. There was testimony that in 2007, the principals discussed paying Fleming the amount due under the disparity note. They agreed interest at the rate of eight percent per year should be added. Prince prepared a spreadsheet to this effect, which was admitted at trial. There is a document, which Prince characterized as "essentially, the pay stub" calculating Fleming's payment, starting with the gross amount of Prince's calculation, which included the interest, and a check to Fleming for the net amount with payroll deductions subtracted. Both the "pay stub" and the check were admitted into evidence. This payment to Fleming was subsequently ratified in the minutes of Invensure's Board of Directors. Invensure's assertion that this evidence is "scant" and "[t]here was no meeting of the minds" on this issue ignores the substantial evidence standard. It is more than sufficient.

Invensure also claims that evidence that it paid interest to Fleming was not evidence it owed Prince the same. This ignores Invensure's counsel's letter to Prince's counsel, during negotiations to unwind the merger, which stated: "[T]he sum remaining [on the disparity note], taking into account an interest factor, is $447,238.65 . . . ." Invensure admitted that interest was due to Prince on the disparity note.

Invensure argues that the documents discussed above do not constitute a written modification, and an oral modification requires consideration. But forbearance

---

[7] In both its opening and reply brief, Invensure asserts the trial court "stat[ed] Prince was not entitled to interest on the contract claim." The volume and page number cited in the record, however, are of the clerk asking a witness to spell her name.

17

can constitute consideration. (*Levine v. Tobin* (1962) 210 Cal.App.2d 67, 69.) The promise to forbear can be implied as well as expressed, and the act of forbearance is itself evidence of an agreement to forbear. (*Ibid.*) Here, once an agreement was reached to add interest to the amounts that were overdue on the disparity note, Prince, rather than file suit against Invensure for the overdue amounts, did not do so. Under the substantial evidence standard, this is sufficient evidence that his forbearance was consideration.

Next, Invensure argues that interest can only be calculated from the date of breach, citing Civil Code section 3287, the general rule relating to prejudgment interest. But Civil Code section 3287 does not apply "where prejudgment interest is part of the contractual amount owed." (*Roodenburg v. Pavestone Co., L.P.* (2009) 171 Cal.App.4th 185, 191.) Accordingly, this argument is without merit.

There was substantial evidence as to the proper amount of interest provided by Deborah Roberts, a certified public accountant, who was called as an expert witness by Prince. She calculated the amount due assuming a starting date of August 6, 2004 (the date of the disparity note), using a rate of eight percent per year. Her calculations were in an exhibit shown to the jury, and totaled $647,706.48. This is the number the jury adopted. The evidence presented was more than sufficient to meet the substantial evidence standard.

### b. *Breach of Contract*

Invensure next argues there is insufficient evidence of a breach of written contract. This argument largely retreads the same ground as the claims relating to the statute of limitations, including the assertion that the agreement was entirely oral. Once again, we reject this contention. The agreement was initially oral and then memorialized in writing. The breach of the agreement was supported by substantial – indeed, largely unconstested – evidence presented at trial regarding Invensure's failure to pay Prince the amount owed on the disparity note. That evidence included Invensure's actions

18

subsequent to the August 6, 2004 agreement, including making payments, agreeing to pay off Fleming, actually paying Fleming, and stating in a letter that Prince was owed the same amount paid to Fleming on the disparity note.

### c. Account Stated/Open Book Account

Invensure next argues there was insufficient evidence on his causes of action for account stated and open book account. Because the verdict was a general one as to all three claims, substantial evidence in support of any of them is sufficient to uphold the judgment. In other words, even if we were to find there was insufficient evidence on these two causes of action, we would still affirm the judgment because there was substantial evidence to support the breach of contract claim. Accordingly, we need not address these claims further.

### 3. Admissibility of Evidence

At trial, Invensure objected to the admission of the two letters from Kroesche, Invensure's counsel, to McIntyre, Prince's counsel.[8] Invensure claimed these letters were settlement negotiations, protected from disclosure by Evidence Code section 1152, and now asserts that the trial court abused its discretion in admitting this testimony. "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.) The trial court determined, in effect, that at the time these negotiations were in process, the parties were not engaged in a dispute covered by Evidence Code section 1152.

Evidence Code section 1152, subdivision (a), provides: "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or

---

[8] Invensure includes this issue as part of its discussion of substantial evidence of Prince's entitlement to interest; we address it separately.

19

damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it." We review the court's decision to admit evidence under Evidence Code section 1152 for abuse of discretion. (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 31-32.)

The letters in question, which we discussed above, were a proposal and counter-proposal in March and April 2012 for Invensure to buy or redeem Prince's one-third interest in Invensure, and hammer out issues such as employees leaving Invensure to go with Prince, and the amount owed by Invensure on the disparity note. The documents read like standard negotiating proposals for such a buyout, and do not include, for example, clauses one would expect to see in a settlement agreement, such as a general release. Prince had not yet made any claim that he had sustained a loss or would sustain a loss; the parties were simply trying to come up with a reasonable division of Invensure's business, given the tense atmosphere and strained relations. They were negotiating a sale, not attempting to settle or compromise a legal dispute.

Given the context and the language of the agreement, we conclude the trial court did not abuse its discretion by determining that these documents did not constitute settlement negotiations. Evidence Code section 1152 does not apply to discussions that precede a dispute. (See *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 481, fn. 3, overruled on other grounds in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1176.) This is true even though litigation may later arise relating to the subject of the discussions. (See *Precadio v. Wilde* (2006) 139 Cal.App.4th 321, 326.)

## B. *Prince's Cross-Appeal*

Prince has cross-appealed from two postjudgment orders. The first is an order partially granting a motion to tax costs brought by Invensure. The second is an order denying his motion for attorney fees under Penal Code section 502. Because Prince

20

is the appellant for purposes of the cross-appeal, he has the burden of demonstrating error.

### 1. *Motion to Tax Costs*

In his memorandum of costs, Prince included the amounts he spent on experts. Invensure then moved to tax costs. Among these costs were the amounts Prince attributed to expert witnesses, who had mostly testified on issues relating to the cross-complaint.

Prince's claim to the expert expenses rested on two offers to compromise under section 998, the first dated January 24, 2014, and the second one dated March 11, 2014. Both used standard Judicial Council forms.

In the January offer, "Plaintiff: Duncan Prince" offered to have judgment entered in his favor and against "defendant" Invensure for $400,000. In the March offer, Prince as plaintiff offered to have judgment entered in favor and against "defendant" Invensure "for $500,000 on the First Amended Complaint only, each party bearing his/its own fees and costs." Neither offer was accepted. Neither offer made any mention of cross-defendant ERM.

The trial court granted the motion to tax in part. It limited Prince's claim for expert fees to the fees incurred for a single expert, Roberts, the certified public accountant, who had testified on Prince's damages for breach of contract and common counts on the amended complaint. The court ruled that "the first [section] 998 offer is ambiguous and the second [section] 998 offer only applied to [Prince's] complaint."

Two subdivisions of section 998 are at issue here, because Prince was both a plaintiff and a cross-defendant. As relevant here, section 998, subdivision (c)(1), provides: "If an offer made by a *defendant* is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition . . . the

21

court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses . . . actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (Italics added.)

Section 998, subdivision (d), provides: "If an offer made by a *plaintiff* is not accepted and the defendant fails to obtain a more favorable judgment or award . . . the court or arbitrator, in its discretion, may require the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the plaintiff, in addition to plaintiff's costs." (Italics added.)

"'As recognized in numerous Court of Appeal decisions, the clear purpose of section 998 . . . is to encourage the settlement of lawsuits prior to trial.' [Citation.] 'Section 998 achieves its aim by punishing a party who fails to accept a *reasonable* offer from the other party. [Citations.]' [Citations.] 'In that situation, the prevailing party is precluded from recovering its own postoffer costs and must pay its opponent's postoffer costs, including expert witness fees, if awarded in the court's discretion. [Citation.] The purpose of the cost-shifting statute is to encourage the settlement of litigation without trial, by punishing the party who fails to accept a reasonable settlement offer from its opponent. [Citation.]' [Citation.]" (*Westamerica Bank v. MBG Industries, Inc.* (2007) 158 Cal.App.4th 109, 129.)

"We independently review whether a section 998 settlement offer was valid. In our review, we interpret any ambiguity in the offer against its proponent. [Citation.] The burden is on the offering party to demonstrate that the offer is valid under section 998. [Citation.]" (*Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86.)

Prince asserts the January offer was "to settle the entire action" for $400,000. It refers to e-mail correspondence between the attorneys asking about this

22

very issue.  Invensure's counsel stated that if the offer was intended to dispose of the entire action, it was rejected, but if referred only to the complaint, Invensure would like an additional week to consider the offer.  Prince's counsel confirmed the offer was indeed intended "to dispose of the entire action."

In support of the court's order, Invensure cites general law about the strict construction of section 998 offers.  (See, e.g., *Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, 732-733.)  Those principles are logical and sound – the point of section 998 is to encourage the acceptance of fair settlement offers, not to allow one party to trap another into a potentially huge costs bill with an ambiguous offer.  But nor do we interpret section 998 to honor form over substance.  (See, e.g., *Menees v. Andrews* (2004) 122 Cal.App.4th 1540, 1544 [rejecting an interpretation of section 998 that allows offering party to "'game the system'"].)  "In interpreting a section 998 offer, general contract principles apply when they neither conflict with nor defeat the statute's purpose of encouraging the settlement of lawsuits prior to trial."  (*Westamerica Bank v. MBG Industries, Inc.*, *supra*, 158 Cal.App.4th at p. 129.)

This is such a case.  Invensure correctly points out that "the offeree must be able to clearly evaluate the worth of the extended offer."  This is correct.  And that is what happened in this case, when Invensure inquired about whether Prince had intended to include disposing of the cross-complaint as part of the offer.  "If the offeree is uncertain about some aspect of the offer . . . he is free to explore those matters with the offeror, or even to make counter-proposals during the period in which the statutory offer remains outstanding."  (*Berg v. Darden* (2004) 120 Cal.App.4th 721, 730-731.)

Invensure claims the January offer was limited on its face to Prince as plaintiff, and not Prince as cross-defendant, and that the correspondence between counsel to clarify Prince's intent "created an ambiguity" by clarifying the offer was intended to apply to the entire action.  We disagree.  The clarification resolved any ambiguity; it did not create it.  We decline to torture basic principles of logic any more than is absolutely

23

necessary. Had Invensure accepted the offer, it would have disposed of the action, resulting in one single judgment. Prince's counsel's response to Invensure's counsel's inquiry that acceptance of the January offer would "dispose of the entire action" also removes any uncertainty that cross-defendant ERM was also intended to be included.[9]

In the context of this case, where two sophisticated parties are represented by counsel, allowing an offer to compromise to be clarified in writing after the offer was made serves the purposes of section 998. Such clarification encourages reasonable settlement offers to be accepted. Permitting a rule of overly strict construction of the language of the offer, despite the parties' actual knowledge of the other's intent, would frustrate this purpose rather than serve it. It would allow the party declining the (as hindsight demonstrated) very reasonable settlement offer to assert a "Gotcha!" defense to the statutory requirement to pay the offering party's postoffer costs. Here, the intent was clear. Invensure knew exactly what Prince was offering. It should not be able to escape the statutory mandate to pay Prince's costs after refusing the offer to compromise.

Accordingly, under basic contract law principles, we find the January offer was valid, and rejected by Invensure. We therefore remand this issue to the trial court for further consideration of the expert witness fees due Prince. Invensure raises several other issues with respect to recovery of expert fees, but we deem those best decided by the trial court in the first instance.

---

[9] Invensure also argues, without citation to authority, that because Prince had separate counsel for the cross-action, his counsel for his role as "plaintiff" was not authorized to make the section 998 offer. There is, however, at a minimum, a rebuttable presumption that counsel had authority to make the offer (see *Gagnon Co. v. Nevada Desert Inn, Inc.* (1955) 45 Cal.2d 448, 459-460), and Invensure has offered nothing to rebut it.

24

*2. Attorney Fees*

In its first amended cross-complaint, Invensure alleged a cause of action under former Penal Code section 502[10] (referred to in this section of the opinion as § 502) claiming Prince and ERM violated subdivisions (c)(1) and (2). Section 502 subdivision (c), states that "any person who commits any of the following acts is guilty of a public offense: [¶] (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. [¶] (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network."

Section 502, subdivision (e)(2), provides: "In any action brought pursuant to this subdivision the court may award reasonable attorney's fees."[11] Invensure's cross-complaint sought attorney fees under this subdivision. At the conclusion of trial, Prince and ERM filed a motion seeking approximately $445,000 of the $864,000 in attorney fees they had spent defending the cross-complaint.

In opposition, Invensure argued that section 502 does not permit a fee award to prevailing defendants and even if they were, the court should exercise its discretion not to award fees in this case. The trial court denied the motion for attorney fees, stating: "The court denies the motion. The cause of action under Penal Code

---

[10] Section 502 has been amended since 2014, when the complaint was filed, although the provisions at issue here have not changed. (Stats. 2014, ch. 379, § 1, eff. Jan. 1, 2015.)

[11] Section 502, subdivision (e)(1), permits a civil action for damages or loss against a violator of subdivision (c).

§ [5]02 is not inextricably linked to the cause of action for theft of trade secrets to allow recovery of intermingled attorneys' fees. The evidence does not allow the court to allocate fees to the § 502 cause of action."

Apparently, the trial court did not question Prince and ERM's right to attorney fees under the statute, and neither do we. A plain reading of the statute permits the court to award attorney fees, in its discretion, in "any action" under it. (§ 502, subd. (e)(2).) Had the Legislature wished the statute to apply only to a prevailing plaintiff, it would have said so. (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572 ["'If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent'"].) Further, Invensure appears to have abandoned this argument on appeal.

That leaves us, then, with the issue of whether the cause of action under section 502 was inextricably linked to the other causes of action in the cross-complaint. (See *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111.) The general rule is that "[w]hen a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action. [T]he joinder of causes of action should not dilute the right to attorney fees. Such fees need not be apportioned when incurred for representation of an issue common to both a cause of action for which fees are permitted and one for which they are not. All expenses incurred on the common issues qualify for an award. [Citation.] When the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not, then allocation is not required. [Citation.]" (*Akins v. Enterprise Rent-A-Car Co*. (2000) 79 Cal.App.4th

26

1127, 1133; see *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-130; *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 417.)

Four of the cross-complaint's eight claims were tried to the jury: breach of fiduciary duty; misappropriation of trade secrets, violation of section 502, and "breach of confidence." In the cross-complaint's cause of action for violation of section 502, Invensure alleged: "Prince and others acting at his and ERM's direction knowingly accessed and without Invensure's permission altered, damaged, deleted, destroyed data contained on Invensure's computers, computer systems, and computer network in order to, among other things, carry out the scheme described in this Cross-Complaint and otherwise wrongfully control or obtain money, property, or data, in violation of . . . section 502[, subdivision] (c)(l)." The cross-complaint continued: "Prince and others acting at his and ERM's direction knowingly accessed and without Invensure's permission took, copied, and made use of data from Invensure's computers, computer systems, and computer network in order to, among other things, carry out the scheme described in this Cross-Complaint, in violation of . . . section 502[, subdivision] (c)(2)."

In the cross-complaint's "General Allegations," Invensure alleged Prince and ERM "knowingly accessed Invensure's computer systems for the purposes of taking Invensure's Confidential Customer Information with them when they left Invensure" and used that information to solicit business from Invensure's customers. The cross-complaint further alleged Prince and ERM "knowingly accessed Invensure's computer system for the express purpose of destroying Invensure's electronic data." These allegations were incorporated by reference into every other cause of action.

Specifically, Invensure alleged the acts that violated section 502 (particularly taking the "Confidential Customer Information") were among the operative

27

facts in its cause of action for misappropriation of trade secrets: "Prince and ERM are using the Invensure Confidential Customer Information, obtained improperly from Invensure without its consent, to compete against Invensure." Thus, the same facts formed the core of both claims.

"'"Attorney fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories." [Citation.]'" (*Harman v. City and County of San Francisco*, *supra*, 158 Cal.App.4th at p. 417; see *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687 ["Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units"]; *Drouin v. Fleetwood Enterprises* (1985) 163 Cal.App.3d 486, 493 ["Attorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories"].)

That is precisely the situation here. The allegations of computer theft, misappropriation of trade secrets, and use of the allegedly stolen material were intertwined throughout the cross-complaint. Accordingly, we find that apportionment was unnecessary in this case, and the trial court erred on this point. We reverse the court's order denying Prince and ERM's request for fees and remand this issue for further proceedings.

## III

## DISPOSITION

The postjudgment orders taxing costs and denying Prince and ERM's request for attorney fees are reversed and remanded to the trial court for further proceedings consistent with this opinion. In all other respects, the judgments are affirmed. Prince is entitled to his costs on appeal.

MOORE, ACTING P. J.

WE CONCUR:

THOMPSON, J.

GOETHALS, J.

29